

# Secondary Signage

Secondary signage consists of "Service," "Pre-owned," Directional, Regulatory and "Hours of Operation" signage. It is a prerequisite that all old signage that deters from or is inconsistent with the current Volkswagen image be removed from the premises before the installation of the new Corporate Identification components.

**All signage orders from VWoA's approved vendor are subject to review and approval by the Volkswagen Corporate Identification team. Unless specifically noted, VWoA's approved vendor must manufacture all secondary signage.** All signage is subject to local ordinances. In the event that a sign is not permitted by local ordinances, the Volkswagen Corporate Identification team will work with Dealer on approved custom solutions.

## "Service" Sign Guidelines:

In addition to the primary signage, Dealer must have a "Service" sign. This sign complements the Volkswagen Nameplate while "lighting the way" for customers seeking service for their vehicles.

Marketplace and non-Marketplace-exclusive facilities must have the Volkswagen-approved "Service" sign.

Non-Marketplace, multi-brand Dealers may have VWoA-approved or generic Service signage.

A building-mounted or pole-mounted flag sign with a "Service" appendage is the only approved Service ground sign.



## "Pre-Owned" Sign Guidelines

VWoA offers an illuminated "Pre-Owned" building sign that complements the Volkswagen Nameplate. This sign is to be installed over the Pre-Owned Sales entrance and may be accompanied with a Volkswagen Clip.



If applicable, Marketplace and non-Marketplace-exclusive facilities must have VWoA-approved Pre-Owned signage.

If applicable, non-Marketplace, multi-brand Dealers may have VWoA-approved or generic Pre-Owned signage.

A building-mounted or pole-mounted flag sign with a "Pre-Owned" appendage is the only approved Pre-Owned ground sign.

## Exterior Directional Sign Guidelines

If applicable, Marketplace and non-Marketplace-exclusive facilities must have VWoA-approved directional signage. These signs are designed to direct customers to particular zones on the Dealership property. These signs may feature information on both sides and may be used to direct customers to other makes from the Volkswagen property, provided no logos are used.

If applicable, non-Marketplace, multi-brand Dealers may have VWoA-approved or generic directional signage.

Logos may not be used on directional signage.

| ← Sales |  |  |
|---|---|---|
| → Service |  |  |

| ← Volkswagen Sales | | |
| Service | | |
| → Mazda Sales | | |
| Service | | |

subject
to review
and approval

23







# Secondary Signage

## Regulatory Sign Guidelines:

Municipal or other regulations often require specific signage for handicap parking or other uses. These signs are available from a VWoA-approved vendor or may be produced locally.

**Parts**
Monday and Thursday 7:30 AM to 9:00 PM
Tuesday, Wednesday, Friday 7:30 AM to 6:00 PM

**Service**
Monday and Thursday 7:30 AM to 9:00 PM
Tuesday, Wednesday, Friday 7:30 AM to 6:00 PM
Saturday 10:00 AM to 3:00 PM

**Sales**
Monday and Thursday 8:30 AM to 9:00 PM
Tuesday, Wednesday, Friday 8:30 AM to 6:00 PM
Saturday 10:00 AM to 3:00 PM

**Roadside Assistance Call 800-411-6688**

## "Hours of Operation" Sign Guidelines:

All Dealers must display their Hours of Operation and Roadside Assistance telephone number at the primary entrance as well as at the Parts & Service entrances.

All Marketplace facilities must have their Hours of Operation and Roadside Assistance telephone number displayed on the sign produced from VWoA's approved vendor. This sign must be installed on the portal per the approved installation instructions.

All non-Marketplace facilities must have white or black Volkswagen or neutral lettering on all main customer entry doors, including the front entrance.

Secondary door postings for all Dealers may be white or black lettering on glass.

Banners

All permanently displayed Volkswagen banners must be the VWoA-approved banners on flag or light poles. A maximum of three of each design (Volkswagen logo and VW Certified Pre-Owned) may be displayed.





VWoA's approved vendor must manufacture



# Secondary Signage

## Miscellaneous Signage

Additional interior signage can be produced to assist customers in the following ways:

Directional signage to further guide customers to Sales, Service and Parts departments, waiting areas, children's play area, restrooms, etc.

Signage for Customer Convenience Amenities such as:

- Shuttle hours
- Night drop-off instructions
- Complimentary beverages/snacks

**COURTESY SHUTTLE AVAILABLE UPON REQUEST**

1:04-cv-01306-JBM-BGC    # 18-17    Page 5 of 25

## Additional interior signage

For Marketplace and non-Marketplace-exclusive Dealers, all miscellaneous signs must be of brushed aluminum with black lettering in Volkswagen font. These signs may be produced locally or by Volkswagen's approved vendor.

All non-Marketplace, multi-brand Dealers may either use brushed aluminum with black lettering in Volkswagen font or generic/neutral signs with neutral lettering (i.e., white sign with black lettering).

- Any additional signage Dealer has created
- Labor Rate Boards
- Service Menu Pricing Boards

Service signage such as:

## Service

| | |
|---|---|
| Oil & Filter Change | $$$$$ |
| Tune Up | $$$$$ |
| Rotate Tires | $$$$$ |
| Disk Breaks | $$$$$ |
| Cooling System Service | $$$$$ |
| Air Conditioner Charge | $$$$$ |
| Automatic Transmission Service | $$$$$ |
| 12,000 Mile Service | $$$$$ |

**Customer Labor Charges Are Based on a Rate of $_.__ Per Hour Based on Hourly Rate.**

# EXHIBIT F

# VOLKSWAGEN MARKETPLACE DESIGN PROGRAM

## *[Brand Separation and Facility Refurbishment]*

## Volkswagen / Audi Facility Construction Agreement

This Agreement (the "Agreement") is entered into by and between Volkswagen of America, Inc. ("VWoA"), and Sud's of Peoria, Inc. d/b/a Sud's Volkswagen and Sud's Audi ("Dealer").

### WHEREAS:

A.    VWoA has developed a dealership showroom presentation program known as the Volkswagen Marketplace Design Program for the benefit of its authorized Volkswagen and Audi Dual dealers, incorporating unique design elements exclusively for the display, sale and marketing of Volkswagen and Audi vehicles (the "Program").

B.    Dealer has agreed to construct a Volkswagen Marketplace "Dual D" level facility at a location approved in advance by VWoA ("Dealer's Premises").

NOW, THEREFORE, VWoA and Dealer agree as follows:

### I.    EXCLUSIVE FACILITY.

#### A.    Design

1.    Survey

VWoA will cause, or prior to the date hereof may have caused, there to be conducted a survey of Dealer's Premises (the "Survey"). The Survey shall be for the purposes of determining the modifications, renovations, construction and design elements ("Refurbishments"). The results of the Survey, at Dealer's option, may be included in Design Control Drawings specific to dealer prepared by VWoA or a supplier to VWoA (the "Drawings").

2.    Design Control Drawings (Optional)

The Design Control Drawings shall set forth the precise specifications required of Dealer's Premises and, once agreed between Dealer and VWoA, shall define the renovations and modifications which Dealer agrees to make to Dealer's Premises. VWoA will provide Dealer with three duplicate originals of the Drawings. The Drawings are for use by Dealer and Dealer's architect and contractor in preparing necessary construction design drawings for which VWoA shall have no responsibility.

3.    Construction Drawings

Dealer agrees to provide a complete set of construction drawings to VWoA for review and approval in accordance with the timelines specified in Paragraph I(B)(3) below.

4.    Charges to Dealer

Dealer will pay _____ $5,500 _____ for the Survey to determine the necessary Refurbishments and will reimburse the reasonable actual out-of-pocket expenses associated with the performance of such survey. If Design Control Drawings are prepared for Dealer by VWoA or a supplier to VWoA, dealer will pay __ $10,450 __ for the drawings and reimburse the reasonable actual out-of-pocket expenses associated with the performance of such drawing.

#### B.    Refurbishment

1.    Dealer will cause the Refurbishments to be made to Dealer's Premises in strict accordance with the construction drawings.

2.    Dealer may not, without VWoA's prior written approval, modify the planned Refurbishments prior to their complete implementation.

3.   Dealer warrants and represents that the Refurbishments will be completed to VWoA's satisfaction in accordance with the timelines outlined below:

   a.   Dealer shall acquire property at a location approved in advance by VWoA for the construction of the Marketplace Dual D Level Facility within six (6) months of the execution of this Agreement and shall provide VWoA a copy of the Warranty Deed or other proof of ownership of the real property.

   b.   Within three (3) months of acquiring the property, Dealer shall complete the necessary survey of the New Dealership Premises, which survey shall determine the required design and construction for the Marketplace Facility.

   c.   Within nine (9) months of acquiring the property, Dealer shall complete and submit to VWoA for its review and approval, construction drawings for the Marketplace Facility. If VWoA submits comments to Dealer on the construction drawings, within 15 business days of Dealer's receipt of such comments, Dealer shall complete and submit to VWoA for its review and approval revised construction drawings for the Marketplace Facility. Within 5 business days of Dealer's receipt of VWoA's approval of Dealer's construction drawings, Dealer shall submit such drawings, together with any and all other necessary documents to the appropriate agency or agencies within the City of Peoria, IL for the obtaining of all necessary building permits for the construction of the Marketplace Facility. Dealer shall comply promptly with each requirement of such agency or agencies for the obtaining of such permits.

   d.   Within twelve (12) months of acquiring the property, Dealer shall begin construction of the Marketplace Facility.

   e.   Within twenty-one (21) months of acquiring the property, Dealer shall complete construction of the facility and have the facility ready for use, in a manner fully approved by VWoA and in accordance with the construction drawings or revised construction drawings approved by VWoA. By that date, Dealer shall occupy the new Marketplace Facility.

   f.   Dealer will provide VWoA with a copy of the executed lease for the New Dealer's Premises prior to date of occupation.

Dealer will give VWoA at least 30 days' advance notice if any deadlines will not be met, along with a detailed written explanation of the reason for delay and a revised completion date.

## C.   Use: Exclusivity

1.   From and after the completion of the Refurbishments, and in consideration of the benefits to be provided by VWoA to Dealer under this Agreement, Dealer agrees that Dealer's Premises shall comply fully with the specifications for brand separation for a Marketplace Dual D Type Facility, as set forth in the schedule of "Required Elements" attached as Schedule A.

2.   Dealer acknowledges that Dealer is agreeing completely voluntarily to provide exclusive new vehicle showroom representation for Volkswagen and Audi products at Dealer's Premises and that no promises or representations have been made to Dealer in exchange for such agreement other than as expressly set forth in this Agreement.

3.   Dealer acknowledges that VWoA has specifically made no promises or representations to Dealer that Dealer's Operations at Dealer's Premises will be profitable in the short or long term, and that Dealer is making the undertakings set forth in this Agreement based solely on Dealer's assessment of the market for Volkswagen and Audi products and the value of VWoA's commitments to Dealer hereunder. Dealer agrees that it is making the Refurbishments and performing Dealer's other undertakings under this Agreement at Dealer's sole business risk, and that VWoA is not responsible, and that Dealer will not seek to hold VWoA responsible, for the profitability of Dealer's Operations or for any losses whatsoever that Dealer may incur. Dealer acknowledges that VWoA's only obligations to Dealer are as specifically set forth in this Agreement and in the separate Volkswagen and Audi Dealer Agreements as they may be in effect between Dealer and VWoA from time to time (the "Dealer Agreement").

**II.    OTHER OBLIGATIONS OF DEALER.**

A.    Volkswagen and Audi Corporate Identity Standards

Dealer agrees that in the construction of the Refurbishments, in all other aspects of Dealer's Premises, and in all other aspects of the conduct of Dealer's Operations, Dealer will incorporate fully all then-current Volkswagen and Audi corporate identity standards, and that Dealer will conform in all respects to all aspects of Volkswagen and Audi trademark standards, in each case as they may be in effect from time to time and as provided by VWoA to Dealer in writing.

B.    Timeliness of Completion and Dealer Incentives for Participation

Dealer agrees it will continuously make progress toward the completion of the Refurbishments. Dealer acknowledges and understands that unless and until Dealer is in full compliance with all terms of this Agreement, VWoA is under no obligation to provide any assistance or benefits whatsoever to Dealer hereunder. Dealer understands and acknowledges that VWoA will not provide such assistance unless all Refurbishments are completed by the timetable outlined in Paragraph I(B)(3) above. In consideration of this Agreement, Dealer will be eligible for payment of a \$250,000 Cash Incentive. In the event of any failure on Dealer's part to conform for any reason whatsoever (unless and until excused by VWoA, which Dealer acknowledges and agrees VWoA has no obligation to do and may do only in VWoA's sole discretion, and which VWoA may arbitrarily withhold) to any provision of this Agreement or the Drawings, then VWoA shall have no obligation to provide to Dealer any of the financial support under such Terms and Conditions as described below in this Agreement.

**III.    VWoA'S OBLIGATIONS.**

A.    Design Assistance

VWoA may from time to time provide Dealer and Dealer's representatives (including Dealer's architect) with drawings, templates, and other types of assistance to facilitate the completion of design drawings by the Dealer's architect, which shall in turn be used for construction of the Refurbishments in accordance with the Program.

B.    Financial Compensation

In consideration of Dealer's voluntary commitment to undertake the Refurbishments and to conform in all other respects to the terms of this Agreement; the Volkswagen and the Audi Dealer Agreements; the Volkswagen Operating Standards and the Audi Retail Capacity Guide; and if Dealer has completed the Refurbishments, and is otherwise in complete compliance with this Agreement, VWoA will provide financial compensation to Dealer as follows:

1.    Payment

Dealer shall be eligible for a maximum cash incentive of **\$250,000,** following completion of the Refurbishments to VWoA's satisfaction.

**IV.    OWNERSHIP TRANSFERS, RELOCATIONS AND TERMINATIONS.**

A.    Ownership Transfers

If, at any time during the Term of this Agreement, Dealer chooses to transfer its principal assets or change majority ownership, then VWoA shall be entitled to terminate this Agreement upon notice to Dealer given any time within 45 business days after Dealer notifies VWoA that Dealer wishes to propose the contemplated transaction. Dealer shall be deemed in default under this Agreement and will be obligated to repay immediately any amounts paid by VWoA hereunder, with interest at the then-current prime rate of interest charged generally by New York banks.

B.    Relocations

If at any time Dealer relocates any significant part of Dealer's new Volkswagen or Audi sales activities from Dealer's Premises, or fails to use Dealer's Premises continuously as the principal location for Dealer's Volkswagen and Audi sales activities, then Dealer shall be deemed in default under this Agreement and will be obligated to repay immediately any amounts paid by VWoA hereunder, with interest at the then-current prime rate of interest charged generally by New York banks. VWoA shall have no further obligation to make any payments to Dealer hereunder; provided, however, that if Dealer has submitted such relocation to VWoA for approval and if VWoA has in fact approved such relocation. This relocation default provision will be effective for the five calendar years subsequent to the execution of this Agreement.

C.    Terminations

If either the Volkswagen or Audi Dealer Agreement between Dealer and VWoA is terminated by Dealer for any reason, or by VWoA for cause, while this Agreement remains in effect, Dealer shall be deemed in default under this Agreement and will be obligated to repay immediately any amounts paid by VWoA hereunder, with interest at the then-current prime rate of interest charged generally by New York banks. VWoA shall have no further obligation to make any payments to Dealer hereunder. This Paragraph IV(C) does not apply to terminations in the context of ownership transfers, which are governed by Paragraph IV(A) above.

D.    Removal of Volkswagen and Audi Identification upon Termination

In the event that Dealer relocates Volkswagen activities from Dealer's Premises after the contemplated construction, the Volkswagen Dealer Agreement is terminated by either party, or Dealer ceases for any other reason whatsoever to be an authorized Volkswagen dealer at Dealer's Premises, Dealer agrees immediately upon such relocation or termination to remove from Dealer's Premises the entry portal element of the facility design and any and all other Volkswagen Trademarks of any kind whatsoever.

In the event that the entry portal is a structural element of the Dealer's facility and cannot be removed, Dealer agrees to paint (or have painted) the entry portal in a neutral color other than yellow.

In the event that Dealer relocates Audi activities from Dealer's Premises after the contemplated construction, the Audi Dealer Agreement is terminated by either party, or Dealer ceases for any other reason whatsoever to be an authorized Audi dealer at Dealer's Premises, Dealer agrees immediately upon such relocation or termination to remove from Dealer's Premises any and all Audi Trademarks of any kind whatsoever.

**V.    INDEMNIFICATION.**

A.    In consideration of the benefits to be received by Dealer from the Refurbishments of Dealer's Premises and the significant financial assistance provided to Dealer by VWoA under this Agreement, Dealer agrees that it will indemnify and hold VWoA harmless against and from any and all loss, damage, claims, costs and expenses whatsoever which arise in any way out of any of the following:

1.    Dealer's breach of any provision of this Agreement.

2.    Any claim by Dealer's landlord that it is entitled to any interest in any Volkswagen or Audi trademark or design element or reimbursement for any damage or repair necessitated by the Refurbishments.

3.    Any claim by any creditor of Dealer that it is entitled to any interest in any Volkswagen or Audi trademark or design element or to any payment from VWoA in respect of this Agreement.

4.    Any claim by any taxing authority that VWoA is responsible for any taxes due respecting the Refurbishments.

5.    Any claim by any person for loss, damage or injury of any kind arising upon or related to Dealer's Premises.

B.    VWoA makes no warranty or representation concerning the quality or function of the design elements or any of the Refurbishments, nor that they will have any effect on Dealer's sales or profitability in either the short or long term, and VWoA hereby expressly disclaims same.

**VI.    TERM AND TERMINATION.**

A.    This Agreement shall remain in effect until the passage of five annual planning periods after the completion of the Refurbishments.

B.    This Agreement may be terminated by VWoA for cause upon 60 days' written notice from VWoA to Dealer, unless such cause is removed to VWoA's satisfaction within such period. In the event VWoA terminates this Agreement for cause, then VWoA shall have no further obligation to make any payments to Dealer hereunder and Dealer shall be obligated to repay VWoA any and all amounts VWoA has theretofore paid hereunder, with interest accruing at the then-current prime rate of interest charged by New York banks generally, from the date VWoA made any payment to Dealer.

**VII.    LEASED FACILITIES.**

In the event the Proposed Dealership Premises are leased, Dealer agrees to obtain permission from the landlord to complete the Refurbishments in the manner contemplated by this Agreement.

**VIII.   GENERAL PROVISIONS.**

A.   Authority to Sign

Dealer acknowledges that only the President, the Core Process Leader, or the Network Development Team Leader of VWoA is authorized on behalf of VWoA to execute this Agreement or to agree to any variation, modification or amendment of any of its provisions or to sign any notice of termination.

B.   Amendments

This Agreement may not be varied, modified or amended except by an express instrument in writing to that effect signed on behalf of both VWoA and Dealer.

C.   Entire Agreement

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof. No representations or statements other than those expressly set forth to or referred to in this Agreement were made or relied upon in entering into this Agreement.

D.   No Assignment

No part of this Agreement or any interest in this Agreement may be transferred by Dealer without the prior written consent of VWoA.

E.   Notices

Any notices under or pursuant to this Agreement will be directed to the respective parties as follows:

If to VWoA:        Network Development Team Leader
                   Volkswagen of America, Inc.
                   3800 Hamlin Road
                   Auburn Hills, MI   48326

                   With a copy to The Secretary, at the same address

If to Dealer:   _____

                _____

                _____

If either party shall have specified another address by notice in writing to the other party, notice shall be sent to the address thus last specified. Notices shall be deemed properly given if delivered personally to any of Dealer's Owners or Executives or sent to Dealer by certified mail or an air express service, in either case with return receipt or other confirmation of delivery. Notices shall be deemed effective when received.

F.   Waivers

The waiver by either party of any breach or violation of or default under any provision of this Agreement will not operate as a waiver of such provision or of any subsequent breach or violation thereof or default thereunder. The failure or refusal of VWoA to exercise any right or remedy shall not be deemed to be a waiver or abandonment of any such right or remedy.

G.   Governing Law

This Agreement will be construed in accordance with the laws of the State of Michigan.   Should the performance of any obligation under this Agreement violate any law of that jurisdiction, then this Agreement shall be deemed modified to the minimum extent necessary to comply with such law.   In the event of any dispute concerning any matter arising under this Agreement, the parties consent to mandatory binding arbitration to be held in Oakland County, Michigan, under the auspices of a nationally recognized arbitration service reasonably mutually acceptable to the parties.

H.    Capitalized Terms

Any term which is capitalized but not specifically defined in this Agreement shall have the meaning ascribed to such term in the Dealer Agreement.

I.    Schedules

The following Schedules are attached to this Agreement and are made a part hereof and incorporated herein by this reference:

Schedule A – Required Elements, Dual Type "D" Facility

| **DEALER:** | **VOLKSWAGEN:** |
|---|---|
| DEALER DBA | VOLKSWAGEN OF AMERICA, INC. |
| By: | By: |
| Name: Gian C. Sud | Name: John Hill |
| Title: **Dealer Principal** | Title: **Volkswagen Network Development** |
| Date: 7-31-03 | Date: 8-4.03 |

**VOLKSWAGEN AREA EXECUTIVE:**

By:

Name: Frank Petru

Title: **Volkswagen Area Executive**

Date: 7-31-03

# VOLKSWAGEN MARKETPLACE DESIGN PROGRAM

## Volkswagen / Audi Facility Construction Agreement

### Schedule "A"

### Required Elements, Dual Type "D" Facility

#### EXTERIOR

Signage to include road pylon, Volkswagen Clip, and dealer nameplate
Entry portal and canopy
Exterior color palette
Outdoor Banners (3 minimum) - If allowed by zoning

#### INTERIOR

**Required Areas**
Parts and accessories retail area
New car delivery area
Children's play area
Customer business center
Separated Volkswagen service write-up area

**Required Elements**
Interior departmental and directional signage
Radius floor plan and tile pattern
Curved back wall
Focal point wall graphic
Approved lighting package
Historic posters
Color and material palette
Product trylons (4 minimum)
Poster stands
Brochure rack
Volkswagen Steelcase furniture
Accommodate future computer kiosk with Internet access

| DEALER: | VOLKSWAGEN: |
| --- | --- |
| | VOLKSWAGEN OF AMERICA, INC. |
| By: | By: |
| Name:  Gian C. Sud | Name:  John Hill |
| Title:  **Dealer Principal** | Title:  **Volkswagen Network Development** |
| Date:  7-31-03 | Date:  8-4-03 |

**VOLKSWAGEN AREA EXECUTIVE:**

By:

Name:  Frank Petru

Title:  **Volkswagen Area Executive**

Date:  7-31-03

# EXHIBIT G

# SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT

THIS SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT (hereinafter called the "Agreement") dated this _31_ day of _July_, 2003 is by and between **Sud's of Peoria, Inc. d/b/a Sud's Volkswagen, d/b/a Sud's Audi**, having its principal place of business at **2350 N. 8th Street, Pekin, IL 61554** (hereinafter called "Borrower"), and Volkswagen of America, Inc., a New Jersey corporation, having offices located at 3800 Hamlin Road, Auburn Hills, Michigan 43826 (hereinafter called "Lender").

WHEREAS, Borrower is engaged in business as an authorized motor vehicle dealer, which includes the sale and service of new and used motor vehicles, parts, and accessories (which business hereinafter shall be called "Borrower's Business") and desires to borrow funds from Lender to be used as working capital in the ordinary course of operating Borrower's Business, or as otherwise agreed to by Lender in writing; and

WHEREAS, Lender is willing to lend to Borrower said capital funds on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration paid by each party to the other, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**1.0    DEFINITIONS**
When used in this Agreement, the following terms shall have the following meanings:

**Account** shall mean any right to payment for Goods sold or leased or for services rendered which is not evidenced by an Instrument or Chattel Paper, whether or not such account has been earned by performance.

**Affiliate** with respect to Borrower shall mean any person, entity or business organization which, directly or indirectly, controls, is controlled by or is under common control with the Borrower.

**Books** shall mean all books, records and correspondence relating to the Collateral, including but not limited to, all ledgers, computer and automatic machinery software and programs, printouts and computer runs and other computer prepared information.

**Chattel Paper** shall mean a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific Goods.

**Collateral** shall mean all property and interests in property or rights in which a security interest is granted by Borrower to Lender in this Agreement pursuant to Section 3 hereof.

**Commitment Letter** shall mean that certain letter attached hereto, if any, between Borrower and Lender, setting forth certain terms and conditions of the Loan.

**Contract Right** shall mean any right of Borrower to payment under a contract for the sale of Goods or the Rendering of services, which right is at the time not yet earned by performance.

**Documents** shall mean any bill of lading, dock warrant or receipt, warehouse receipt or order for the delivery of Goods.

**Effective Net Worth** shall mean the reported net worth of Borrower plus subordinated notes payable and net LIFP reserve, minus Affiliate, officer and employee receivables, net unamortized leasehold improvements, intangible assets and all other assets not directly related to Borrower's Business.

**Equipment** shall mean Goods together with any and all accessions, parts and appurtenances thereto, used or bought for use or hereafter bought for use primarily in Borrower's Business which are not included in the definition of inventory.

**Event of Default** shall means the occurrence of any of the events as contained in Section 8 of this Agreement.

**General Intangibles** shall mean any personal property (including things in action) other than Goods, Accounts, Chattel Paper, Documents, Instruments and money.

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT    (CONT'D)

**Goods** shall mean all things which are movable at the time the security interest attaches or which are fixtures.

**Instrument** shall mean a negotiable instrument or a security or any other writing which evidences a right to the payment of money.

**Inventory** shall mean any and all Goods, now owned or hereafter acquired by Borrower, which are held for sale or lease or are furnished or to be furnished under a contract of service.

**Net Working Capital** shall mean the excess of Borrower's current assets over Borrower's current liabilities.

**Obligation** shall mean any and all liability, obligation, or indebtedness owed pursuant to the terms and conditions of this Agreement and any and all other agreements, promissory notes, guaranties and contractual arrangements of every kind and nature between Borrower and Lender, whether now or hereafter in existence.

**Proceeds** shall mean whatever is received upon the sale, exchange, collection or other disposition of the Collateral or proceeds, whether cash proceeds or non-cash proceeds.

**2.0    THE LOAN**

**2.1**    Lender hereby agrees to loan to Borrower, and Borrower hereby agrees to borrow from Lender, an amount which shall be evidenced by a promissory note (the "Note") to be executed by Borrower concurrently herewith, which Note shall be in substance and form satisfactory to Lender. The amount borrowed may be increased from time to time upon written request of Borrower approved by Lender. The initial loan and any new advances evidencing increases to the initial loan (hereinafter in the aggregate referred to as the "Loan") shall be subject to the terms and conditions of this Agreement. The Loan may be prepaid at any time in whole or in part without penalty.

**2.2**    The Note shall evidence the terms of repayment of the Loan. The Loan shall bear interest upon the unpaid balance thereof at the rate of interest stated in the Note. Principal and interest shall be due and payable on the date(s) and in the amounts as specified in the Note.

**2.3**    Borrower and Lender agree that it is their respective intentions, and they do specifically agree: (a) that this Agreement, the Note issued hereunder, and any subsequent promissory notes issued hereunder evidencing new advances, and any subsequent agreements between the parties, provide for cross collateralization and cross rights to declare a default, whereby all Collateral is security for all Obligations; (b) upon the occurrence of an Event of Default, all Obligations shall be matured, immediately due and payable, notwithstanding any maturity date thereof, or agreements thereto, to the contrary; and (c) that the agreements contained in this Section 2.3 shall be, and are hereby, made a part of all agreements between Borrower and Lender, whether now or hereafter in existence.

**3.0    SECURITY**

**3.1**    As security for the prompt and complete payment and performance when due of all Obligations due Lender, Borrower hereby grants to Lender a continuing security interest in all of Borrower's right, title and interest in, to and under the following Collateral, whether now owned or hereafter acquired:

(a)    all of Borrower's Accounts, Books, Contract Rights, Documents, Instruments, Chattel Paper and General Intangibles;

(b)    all of Borrower's Equipment, furniture, fixtures, machinery and supplies;

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT    (CONT'D)

(c)    all of Borrower's Inventory, including but not limited to all new and used motor vehicles, and all automotive parts and accessories; and

(d)    all Proceeds and products of any of the foregoing.

**3.2**    As further and additional security, Borrower hereby assigns to Lender all credits which are now or hereafter become due to the Borrower from Volkswagen of America, Inc., its subsidiaries, affiliates or associated companies, or such other manufacturer from which Borrower purchases its inventory.

## 4.0   BORROWERS' WARRANTIES

To induce Lender to enter into this Agreement to make the loan contemplated hereby, Borrower represents and warrants as follows:

**4.1**    Borrower operates Borrower's Business in the form of business organization and from the principal place of business as set forth in the introductory paragraph of this Agreement, and Borrower is in good standing, duly authorized, licensed and franchised to operate Borrower's Business.

**4.2**    All balance sheets, statements of profit and loss and other financial data which have been furnished by Borrower to Lender fairly present the financial condition of Borrower's Business as of the dates stated therein, and the results of its operations for the periods for which the same are furnished; all other information, reports, papers and data furnished to Lender are accurate and correct in all material respects and complete insofar as completeness may be necessary to give Lender a true and accurate knowledge of the subject matter, and there has been no change in the business, earnings, prospects, assets, liabilities or condition (financial or otherwise) of Borrower's Business from that set forth in the most recent financial statements furnished by Borrower to Lender other than changes in the ordinary course of Borrower's Business, none of which changes have been materially adverse.

**4.3**    None of the assets of Borrower's Business is, as of the date hereof, subject to any mortgage, pledge, lien or encumbrance in favor of anyone other than Lender except liens of the kind permitted by Section 6.2 hereof, unless otherwise agreed to by Lender in writing.

**4.4**    There is not now pending against Borrower, nor, to the knowledge of counsel to Borrower or Borrower or to the officers, managers or principals of Borrower's Business, is there threatened any litigation or legal, administrative or tax proceedings, investigations or other action or matter, the outcome of which in the opinion of counsel to Borrower or Borrower or such officers, managers or principals could materially adversely affect the continued operation or condition (financial or otherwise) of Borrower's Business.

**4.5**    Borrower warrants that there exists on the date of this Agreement no Event of Default and no event which with the lapse of time would become an Event of Default.

**4.6**    Borrower warrants that it is and shall remain the lawful owner of the Collateral, free of all liens and claims whatsoever, other than the security interest created hereby or pursuant hereto, or specifically allowed by this Agreement, and has the authority and right to subject the Collateral to the security interest granted to Lender by this Agreement.

## 5.0   BORROWER'S AFFIRMATIVE COVENANTS

Borrower hereby covenants and agrees that, for so long as there shall remain any indebtedness hereunder.

**5.1**    Borrower will maintain the existence in good standing of Borrower's Business, and continue to keep in full force and effect any and all licenses, franchises and other authorization necessary to conduct Borrower's Business.

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT    (CONT'D)

5.2    Borrower will keep proper Books of the operations of Borrower's Business satisfactory to Lender. Borrower will furnish to Lender within 20 days after the end of each month, for so long as this Agreement shall be effective, balance sheets and statements of profit and loss for each month with respect to Borrower's Business (and, upon request of Lender, Affiliates of Borrower), in such detail as Lender reasonably may require from time to time, and within 120 days after the close of each of Borrower's fiscal years hereafter, for so long as this Agreement shall remain in effect, Borrower will furnish Lender a completed, executed copy of a report of an examination of the financial affairs of Borrower's Business (and, upon request of Lender, Affiliates of Borrower) made by independent certified public accountants selected by Borrower and acceptable to Lender such report of Borrower's Business and Affiliates, where applicable, to be in such detail and with such certification as Lender reasonably may required from time to time; and Borrower will furnish such other financial statements as Lender reasonably may require from time to time. Borrower will permit Lender to inspect and make copies of the Books of Borrower's Business at all reasonable times and from time to time. All such balance sheets, statements of profit and loss and other financial statements as Borrower may furnish hereunder will fairly present the financial condition of Borrower's Business and Affiliates, where applicable, as of the dates and for the periods for which the same are furnished and shall be certified as true and correct by an appropriate officer of Borrower or Affiliate as applicable.

5.3    At the time any asset of Borrower's Business is assigned, mortgaged, pledged or otherwise hypothecated to Lender as security for any Obligation, Borrower will be the lawful owner thereof, the same being free from all encumbrances except as specifically stated in the instrument by which the same shall be so assigned, mortgaged, pledged or otherwise hypothecated; and the Borrower will warrant and defend the same against all claims and demands of any kind of nature.

5.4    Borrower promptly will pay when due all contractual obligations calling for the payment of money, taxes, assessments and changes imposed upon Borrower and upon Borrower's Business and Borrower's properties, assets, operations, products, income or securities and also promptly will pay all claims which constitute, or, if unpaid, may become a lien, charge or encumbrance upon Borrower's Business or any of Borrower's properties, assets, operations, products, income or securities.

5.5    Borrower shall be responsible for all loss and damage to Borrower's Business and agrees to keep Borrower's Business insured against loss or damage by fire, theft, collision and vandalism and against such other losses as Lender may require from time to time. Insurance policies for the said insurance shall be with such companies and in such amounts and in such form as shall be satisfactory to Lender. All such policies of insurance shall contain an endorsement in form and substance satisfactory to Lender, showing loss payable to Lender as its interest may appear, and a certificate of insurance evidencing such coverage will be provided to Lender.

5.6    Borrower will, upon request of Lender, execute such financing statements and other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by Lender) and do all such other acts and things as Lender may from time to time request, to establish and maintain a valid first perfected security interest in the Collateral (free of all other liens and claims whatsoever except as otherwise expressly provided herein) to secure the payment of the Obligations.

5.7    Borrower will keep, at the address designated above, all Books concerning the Collateral, which Books will be of such character as will enable Lender or its designees to determine at any time the status of the Collateral.

# SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT   (CONT'D)

5.8    Borrower will, upon request of Lender, stamp on its Books concerning the Collateral, a notation or other notice(s), in form satisfactory to Lender, or take such other action to place third parties on notice of the security interest of Lender in the Collateral.

5.9    Borrower will, upon request of Lender, immediately deliver to Lender, appropriately endorsed to the order of Lender, any note, trade acceptance, installment contract, chattel paper or other writing for the payment of money which shall be received by Borrower and which may at any time evidence any obligation to Borrower for payment for Goods sold or services rendered.

5.10   Borrower will not sell, assign, create or permit to exist any lien on or security interest in any Collateral to or in favor of anyone other than Lender, other than the sale of inventory in the ordinary course of Borrower's Business.

5.11   Borrower will, at Borrower's sole cost and expense, keep the Collateral in as good and substantial repair and condition as the same is now or at the time the lien and security interest granted by this Agreement shall attach thereto, reasonable wear and tear excepted, making repairs and replacements when and where necessary. Borrower will further take all action necessary to insure that the real estate upon which the Borrower's Business is located shall be free of hazardous conditions, substances and pollutants of any kind.

5.12   Borrower shall apply the proceeds of the Loan for the purposes set forth in this Agreement and shall furnish such evidence thereof as Lender may request.

5.13   Borrower shall maintain a value of Collateral to Loan ratio as may be established by Lender in writing from time to time.

6.0   **BORROWER'S NEGATIVE COVENANTS**

Borrower hereby covenants and agrees that, for so long as there shall remain any Obligation owing to Lender, it will not, without the prior written consent of Lender.

6.1    Create or have outstanding any indebtedness for money borrowed other than from Lender.

6.2    Create, permit or suffer to exist any mortgage, lien or other encumbrance to be levied upon or become a charge against Borrower's Business or any of its properties, assets, operations, products, income or securities other than mortgages, liens of other encumbrances in favor of Lender, liens for taxes not delinquent or being contested in good faith, liens of mechanics or materialmen arising in the ordinary course of Borrower's Business with respect to liabilities which are not overdue or which are being contested in good faith, and liens resulting from deposits or pledges to secure payments of worker's compensation, unemployment insurance, old age pensions or social security.

6.3    Endorse, guarantee or become surety for the payment of any debt or liability, of any individual, partnership or corporation, directly or contingently, except for recourse on the obligations of retail purchasers of Inventory from Borrower and in connection with endorsing checks and other negotiable instruments for deposit and collection.

6.4    Sell, exchange, transfer or otherwise dispose of any of its properties, assets, operations or products except in the normal course of Borrower's Business, consolidate Borrower's Business with or merge Borrower's Business into any other business concern or permit any other business concern to consolidate with or merge into Borrower's Business; or sell, exchange, transfer, lease or otherwise dispose of all or any substantial part of its capital assets; or make or have outstanding any loan or advance to any individual, partnership or corporation, purchase any security of any corporation or invest in the obligations of any individual, partnership or corporation.

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT  (CONT'D)

**6.5**  Make expenditures in any fiscal year in excess of that amount agreed to by Lender in writing from time to time.

**6.6**  Permit the Net Working Capital and Effective Net Worth of Borrower's Business to be less than those amounts agreed to by Lender in writing from time to time.

**6.7**  Make any loan to or increase the present salary or drawing account of any principal, officer or manager of Borrower's Business, directly or indirectly, or permit any of the foregoing to withdraw from Borrower's Business money in any manner other than in the normal and usual course of Borrower's Business.

**6.8**  Make a distribution of dividends to its stockholders.

### 7.0   OWNERSHIP AND MANAGEMENT OF BORROWER'S BUSINESS

**7.1**   Lender has elected to enter into this Agreement and to make the Loan contemplated hereby with reliance and confidence in the integrity and ability of the persons presently having ownership interest in or being in the active management and operation of Borrower's Business as disclosed to Lender concurrently herewith, and in reliance that said persons are and shall continue to have the same ownership interest in or be in the active management and operation of Borrower's Business or both, as the case may be, so long as this Agreement remains effective and the Obligations remain outstanding.

### 8.0   EVENTS OF DEFAULT AND REMEDIES

**8.1**  Each one or more of the following acts or occurrences shall constitute an Event of Default hereunder.

(a)  If Borrower fails to make the due and punctual payment of all or any portion of any payment of principal or interest due or to become due hereunder or the Note or under any other agreement between Borrower and Lender, including, without limiting the generality of the foregoing, failure in the prompt payment of notes evidencing the financing of Borrower's inventory of new and/or used motor vehicles or any other Obligations; or

(b)  If failure shall be made in the due observance or performance of any covenant, agreement or condition to be performed by Borrower or any guarantor hereof; or

(c)  If any representation or warranty made by Borrower to Lender shall have been determined by Lender to be untrue in any materials respect as of the date that any such representation or warranty was made; or

(d)  The occurrence (i) of Borrower becoming insolvent or bankrupt, or ceasing, being unable or admitting in writing its inability to pay its debts as they mature, or making a general assignment for the benefit of, or entering into any composition or arrangement with creditors (ii) of proceedings for the appointment of a receiver, trustee, or liquidator of the Borrower or of a substantial part of its assets, being authorized or instituted by or against Borrower or (iii) of proceedings under the United States Bankruptcy Code or other bankruptcy, reorganization, readjustment of debt, insolvency, dissolution, liquidation or other similar law of any jurisdiction being authorized or instituted against the Borrower; or

(e)  If there is now or shall hereafter be any change in the ownership interest in or active management and operation of Borrower's Business; or

(f)  If Lender deems it is insecure for any reason or Borrower's Business is in danger of misuse, loss, seizure or confiscation; or

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT    (CONT'D)

(g)    If any judgment against or levy, execution, attachment or other proceedings are commenced or obtained in connection with a judgment or otherwise against, or a receiver appointed of, or writ of attachment or garnishment is issued against the Borrower or a substantial part of the assets of Borrower; or

(h)    If Lender in good faith reasonably believes the margin of Collateral to the outstanding Obligations is so insufficient that the prospect of payment is impaired or otherwise insecure; or

(i)    The termination of any franchise authorizing Borrower to sell motor vehicles at the address stated above.

(j)    If any guaranty given to Lender to guarantee or secure the performance of the obligations of Borrower hereunder, under the Note or under any other agreement between Borrower and Lender or which is given by Borrower for the benefit of Lender, shall be revoked, either in whole or in part, or shall otherwise become unenforceable, either in whole or in part, for any reason whatsoever.

(k)    Any guarantor of the obligations of Borrower hereunder, under the Note or under any other agreement between Borrower and Lender or which is given by Borrower for the benefit of Lender shall be in breach or default with respect to any covenant or obligation contained in its guaranty to Lender or in any deed of trust, security agreement, or other agreement, document or instrument which secures such guaranty.

(l)    The occurrence, with respect to any guarantor of the obligations of Borrower, of any of the events or proceedings described in Section 8.1(d) above.

8.2    Upon the existence of an Event of Default, all outstanding Obligations of Borrower to Lender will (notwithstanding any provisions to be contrary) without demand or notice of any kind, thereupon immediately become due and payable; and Lender may, without any notice to Borrower, notify any parties obligated to Borrower on any of the Collateral to make payment to Lender of any amounts due or to become due thereunder and enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon request of Lender, Borrower will, at its own expense, notify any parties obligated to Borrower on any of the Collateral to make payment to lender of any amounts due or to become due thereunder. In addition, Lender may take possession of the Collateral and any Books concerning same wherever they may be found, with our without process of law, and may dispose of the Collateral or any portion thereof in any manner permitted by law. Unless otherwise agreed to by the parties in writing, any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly made if given at least seven days before such disposition.

## 9.0    APPOINTMENT OF LENDER AS ATTORNEY

9.1    When an Event of Default shall occur and be continuing, Borrower hereby irrevocably appoints Lender as attorney–in-fact with power of substitution to act for Borrower in Borrower's name or in the name of Lender, or otherwise, for the use and benefit of Lender hereunder, at the expense of Borrower, provided that in no event shall this appointment impose any duty on Lender to act initially or thereafter, as this appointment is made solely to allow Lender to protect its interests in the Collateral from time to time at its option. This special power of attorney shall include, but not be limited to, the hereinafter enumerated acts:

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT    (CONT'D)

    (a)    to execute and deliver, or otherwise take any action deemed appropriate by Lender regarding any deed, lease, assignment, security agreement, certificate of title, chattel mortgage vehicle registration, bill of sale, release and such other instruments as may be necessary to sell, assign, transfer, pledge or otherwise deal with the property of Borrower which is or shall hereafter become Collateral of Lender under this Agreement and any amendments hereto;

    (b)    to demand, collect, receive payment on, release and otherwise take any action deemed appropriate by Lender regarding all claims or money due or to become due to the Borrower in connection with the purchase, sale, damage or destruction of any of the Collateral, to settle and compromise any such claim, to receive and open any mail addressed to Borrower, and to endorse checks for collection, deposit or payment, and execute and deliver waivers, releases, covenants not to sue, or other legal instruments deemed necessary to effect such collection, settlement or compromise; and

    (c)    to prosecute or otherwise take any action deemed appropriate by Lender in the name of Lender or in the name of Borrower, or otherwise, any action or proceeding to collect any such claim or to enforce the right of Borrower for the benefit of Lender.

**10.0    GENERAL**

Borrower and Lender further agree that:

**10.1**    Lender shall, at all times, have the right to setoff and apply any and all credits, monies or properties of Borrower in Lender's possession or control against any Obligations of Borrower to Lender. All payments by Borrower or other funds of Borrower held or received by Lender, other than regular monthly installments of principal and interest due of the Note, shall be applied to the last maturing installments under said Note in inverse order of maturity.

**10.2**    The acceptance by Lender of any installment or payment after it becomes due or the waiver by Lender of any other Event of Default shall not be deemed to alter or affect Borrower's Obligations and/or Lender's rights with respect to any subsequent payment or Event of Default.

**10.3**    All of the agreements, representations and warranties contained in this Agreement or in any other instrument or document delivered pursuant thereto shall survive the delivery of the Note and any extensions, renewals or substitutions thereof and shall continue in full force and effect as long as there shall remain Obligations owing to Lender from Borrower.

**10.4**    All negotiations, correspondence and memoranda passed between the parties hereto with regard to the transactions contemplated by this Agreement (other than the Commitment Letter, if any), are merged hereby and this Agreement cancels and supersedes all prior agreements between the parties with regard thereto. This Agreement may be assigned, altered, modified or abridged only by a written instrument duly executed by the authorized representatives of Lender and Borrower.

**10.5**    It is intended that this Agreement shall not be in violation of any valid law applicable hereto now or hereafter from time to time in effect in any jurisdiction and in event any provision hereof in any way contravenes any of said laws, this Agreement shall be considered valid except as to such provisions.

**10.6**    Any notice given hereunder shall be in writing and given by personal delivery or shall be sent by U.S. mail, postage prepaid, addressed to the party to be charged with such notice, at the respective address as set forth above, or such other address as may be provided in writing.

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT    (CONT'D)

10.7    This Agreement shall be binding upon and shall inure to the benefit of the executors, administrators, legal representatives, successors and assigns of the parties.

10.8    This Agreement, and all rights and obligations hereunder, shall be governed by the laws of the State in which the Borrower is located, as indicated by its address set forth above.

**11.0**    **AUTHORITY**

Borrower shall furnish to Lender upon execution of this Agreement such proof of its authority to enter into this Agreement, to make the Note and to deposit the said security with Lender as Lender from time to time reasonably may request, including, without limiting the generally of the foregoing, an opinion of Borrower's counsel and, if Borrower is a corporate, certified copies of resolutions of Borrower's stockholders, board of directors, or other managers.

**12.0**    **WAIVER OF JURY TRIAL**

LENDER AND BORROWER ACKNOWLEDGE AND AGREE THAT THERE MAY BE A CONSTITUTIONAL RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY CLAIM, DISPUTE OR LAWSUIT ARISING BETWEEN THEM, BUT THAT SUCH RIGHT MAY BE WAIVED ACCORDINGLY, THE PARTIES AGREE:

(A)    NOTWITHSTANDING SUCH CONSTITUTIONAL RIGHT, IN THIS COMMERCIAL MATTER THAT PARTIES BELIEVE AND AGREE THAT IT SHALL BE IN THEIR BEST INTEREST TO WAIVE SUCH RIGHT AND, ACCORDINGLY, HEREBY WAIVE SUCH RIGHT TO A JURY TRIAL AND FURTHER AGREE THAT THE BEST FORUM FOR HEARING ANY CLAIM, DISPUTE OR LAWSUIT, IF ANY, ARISING IN CONNECTION WITH THIS AGREEMENT OR RELATIONSHIP BETWEEN LENDER AND BORROWER, INCLUDING, BUT NOT LIMITED TO, IN CONNECTION WITH THE COLLECTION OF THE LOAN OR OTHER OBLIGATION SHALL BE A COURT OF COMPETENT JURISDICTION SITTING WITHOUT A JURY.

(B)    THIS WAIVER OF JURY TRIAL IS FREELY, KNOWINGLY AND VOLUNTARILY GIVEN BY EACH PARTY, WITHOUT ANY DURESS OR COERCION, AFTER EACH PARTY HAS CONSULTED WITH ITS COUNSEL AND HAS CAREFULLY AND COMPETELY READ ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, SPECIFICALLY INCLUDING THIS WAIVER OF JURY TRIAL PROVISION.

(C)    NEITHER LENDER NOR BORROWER SHALL BE DEEMED TO HAVE RELINQUISHED THIS PROVISION WAIVING JURY TRIAL EXCEPT BY A WRITING SIGNED BY AN OFFICER OF LENDER AND BORROWER RELINQUISHING THIS WAIVER OF JURY TRIAL PROVISION.

## SECURITY AGREEMENT AND CAPITAL LOAN AGREEMENT   (CONT'D)

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement on the date first above written.

Sud's of Peoria, Inc. d/b/a Sud's Volkswagen, d/b/a Sud's Audi

By: _____

   Gian C. Sud, President

**VOLKSWAGEN OF AMERICA, INC.**

By: _____       By: _____

   Witness                                    Joseph S. Folz

                                           ~~Assistant~~ Secretary