E-FILED
Wednesday, 21 February, 2007  02:36:31 PM
Clerk, U.S. District Court, ILCD

# United States Court of Appeals

## For the Seventh Circuit

### Chicago, Illinois 60604
### NOTICE OF ISSUANCE OF MANDATE

*FILED*
*FEB 2 1 2007*
*JOHN M. WATERS, Clerk*
*U.S. DISTRICT COURT*
*CENTRAL DISTRICT OF ILLINOIS*

DATE:     February 20, 2007

TO:       John M. Waters
          United States District Court
          Central District of Illinois
          Room 309
          100 N.E. Monroe Street
          Peoria, IL  61602


FROM:     Clerk of the Court

RE:       05-3276
          Volkswagen America v. Sud's Peoria Inc
          04 C 1306, Joe Billy McDade, Judge

          Herewith is the mandate of this court in this appeal, along
          with the Bill of Costs, if any.  A certified copy of the
          opinion/order of the court and judgment, if any, and any
          direction as to costs shall constitute the mandate.

          [ ] No record filed
          [X] Original record on appeal consisting of:

**ENCLOSED:**                                **TO BE RETURNED AT LATER DATE:**

          [1]     Volumes of pleadings                    [ ]
          [ ]     Volumes of loose pleadings              [ ]
          [ ]     Volumes of transcripts                  [ ]
          [ ]     Volumes of exhibits                     [ ]
          [ ]     Volumes of depositions                  [ ]
          [ ]     In Camera material                      [ ]
          [ ]     Other_____   [ ]

                  Record being retained for use           [ ]
                  in Appeal No. _____

          Copies of this notice sent to:          Counsel of record
          [ ]     United States Marshal
          [ ]     United States Probation Office

**NOTE TO COUNSEL:**
          If any physical and large documentary exhibits have been filed in
          the above-entitled cause, they are to be withdrawn ten days from the
          date of this notice.  Exhibits not withdrawn during this period will
          be disposed of.

          Please acknowledge receipt of these documents on the enclosed copy
          of this notice.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
          Received above mandate and record, if any, from the Clerk, U.S.
          Court of Appeals for the Seventh Circuit.
Date: _____
(1071-120397)                          Deputy Clerk, U.S. District Court

# United States Court of Appeals

### For the Seventh Circuit

### Chicago, Illinois 60604

### JUDGMENT - WITH ORAL ARGUMENT

**Date: January 29, 2007**

**BEFORE:**     Honorable WILLIAM J. BAUER, Circuit Judge

Honorable KENNETH F. RIPPLE, Circuit Judge

Honorable ILANA DIAMOND ROVNER, Circuit Judge

No. 05-3276

VOLKSWAGEN OF AMERICA, INCORPORATED,
                    Plaintiff - Appellee
   v.

SUD'S OF PEORIA, INCORPORATED, doing business as VOLKSWAGEN
and SUD'S AUDI, an Illinois Corporation, GIAN C. SUD, an
Illinois Resident, HARISH C. SUD, an Illinois Resident, et al.,
                    Defendants - Appellants

Appeal from the United States District Court for the
Central District of Illinois
No. 04 C 1306, Joe Billy McDade, Judge

      The judgment of the District Court is AFFIRMED, with costs,
in accordance with the decision of this court entered on this date.

(1061-110393)

CERTIFIED COPY

CERTIFIED COPY
A True Copy:
Teste:

Clerk of the United States
Court of Appeals for the
Seventh Circuit

CERTIFIED COPY

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3276

VOLKSWAGEN OF AMERICA,
INCORPORATED,

*Plaintiff-Appellee,*

*v.*

SUD'S OF PEORIA, INCORPORATED,
doing business as VOLKSWAGEN
and SUD'S AUDI, an Illinois
Corporation, GIAN C. SUD, an
Illinois Resident, HARISH C. SUD,
an Illinois Resident, et al.,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 1306—**Joe Billy McDade,** *Judge.*

---

ARGUED MAY 8, 2006—DECIDED JANUARY 29, 2007

---

Before BAUER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Volkswagen of America, Inc.
("Volkswagen") brought this diversity action against one
of its car dealerships, Süd's of Peoria, Inc. ("Süd's"), for
breach of contract. Invoking the Federal Arbitration Act,
9 U.S.C. §§ 1-16, Süd's moved to stay the entire action

No. 05-3276

pending arbitration. The district court denied the motion
in part; Süd's now has appealed. *See id.* § 16. For the rea-
sons set forth in the following opinion, we affirm the
judgment of the district court.

## I

## BACKGROUND

### A. Facts

In the summer of 2003, Süd's, through its three prin-
cipal owners, contracted with Volkswagen to open an
authorized Volkswagen vehicle dealership. At the time
negotiations began, Süd's was conducting its operations in
a vehicle showroom in Peoria, Illinois. In the 2003 agree-
ment, in exchange for the right to sell Volkswagen auto-
mobiles, Süd's agreed to redesign its existing facility
according to Volkswagen's uniform design specifications.
Additionally, the parties' arrangement contemplated that
Süd's soon would move its operations to a new site in
nearby Pekin, Illinois.

The parties signed three additional agreements. First,
a "Facility Construction Agreement" ("Construction Agree-
ment") outlined a timetable and general design specifica-
tions for the construction of the new facility. According
to the terms of the Construction Agreement, Süd's had
twenty-one months from the date on which it acquired
the new property to complete construction of the facility
and have it ready for use. The agreement set intermediate
deadlines for Süd's to complete a land survey, to prepare
design plans and to furnish a warranty deed for the new
property. The Construction Agreement also contained the
following arbitration clause:

> In the event of any dispute concerning any matter arising under this Agreement, the parties consent to mandatory binding arbitration to be held in Oakland County, Michigan, under the auspices of a nationally recognized arbitration service reasonably mutually acceptable to the parties.

R.5, Ex.F at 5.

The parties also entered into a financing arrangement to fund construction of the new facility. Under the terms of a "Memorandum of Understanding-Capital Loan Agreement" (the "Loan Agreement"), Volkswagen agreed to extend to Süd's a $500,000 loan at an interest rate of 4.25%. In paragraph two of the Loan Agreement, Süd's, in turn, promised to service the loan with monthly interest payments and to repay the principal in five annual installments of $100,000 due at the end of each year. In paragraph four of the Loan Agreement, Süd's also agreed to execute and comply fully with the terms of the Construction Agreement. Failure to do so, the provision stated, required immediate repayment of the loan balance and accumulated interest.

Lastly, the parties agreed to a "Performance Incentive Program" (the "Incentive Program"), which allowed Süd's to earn five, annual "incentive" payments of $100,000 from Volkswagen, in addition to a $60,000 bonus incentive at the end of the five-year period. The incentive payments were timed to coincide with Süd's loan obligations so that Süd's could use its yearly $100,000 earned incentive to make its annual, $100,000 loan payment. To earn the incentives, Süd's was required to comply with the minimum requirements of the Volkswagen Dealer Operating Standards, a component of the parties' franchise agreement that governed the general design and operations

of authorized Volkswagen dealerships. Additionally, the earning of incentives depended on Süd's execution of, and full compliance with, the Construction Agreement. If Süd's violated the Construction Agreement in year one, it would not earn the incentive payment for that year and also would be disqualified from earning future payments. As construction of the new facility began, Volkswagen paid Süd's a $20,000 advance to be earned later under the Incentive Program.

## B. District Court Proceedings

On September 7, 2004, Volkswagen filed this diversity action for breach of contract against Süd's and its three principal owners, each of whom had executed guarantees on Süd's performance. After several failed attempts to resolve their differences amicably, Volkswagen filed an amended complaint on March 11, 2005, reasserting its breach of contract claims. At the heart of the complaint were allegations that Süd's had failed to meet the time line set forth in the parties' Construction Agreement; Süd's allegedly did not begin construction on time, failed to acquire property for the new facility and did not tender the construction plans required by that agreement. According to Count I of the complaint, this breach of the Construction Agreement placed Süd's in default of its loan obligations; Count I also asserted, in the alternative, that Süd's had defaulted on its loan obligations by failing to remit its first annual payment on time. Volkswagen sought full repayment of the $500,000 loan principal.

Count II of the complaint alleged breach of the Incentive Program and sought recovery of the $20,000 advance. According to Count II, Süd's had violated the Incentive

Program in two ways. First, Süd's allegedly had disqualified itself from earning incentives by violating the terms of the Construction Agreement. Second, Süd's allegedly had not complied with the franchise agreement's Dealer Operations Standards, a precondition to receiving incentives, because it failed "to order, install, or display at its current dealership premises a Volkswagen facade dealer nameplate that complies with [Volkswagen's] current corporate identity standards." R.17 at 8.

Relying upon the Construction Agreement's arbitration provision, Süd's notified Volkswagen of its intent to submit the matter to arbitration. It then moved, under the FAA, to stay the action in the district court pending an arbitrator's resolution of the dispute. The district court granted the motion in part and denied it in part. Addressing Count I of Volkswagen's complaint—breach of the Loan Agreement—the court stayed the issues related to Süd's compliance with the Construction Agreement because of that contract's arbitration clause. However, the court refused to stay the question of whether Süd's had madè its loan payments on time. In the court's view, the Loan Agreement did not provide for arbitration and did not incorporate the Construction Agreement's arbitration clause for matters unrelated to construction.

With respect to Count II—breach of the Incentive Program—the court also stayed one issue but not the other. The court held that failure to install a dealer nameplate was non-arbitrable because the Motor Vehicle Franchise Contract Arbitration Fairness Act of 2002 ("Fairness Act"), 15 U.S.C. § 1226, requires the parties to arbitrate disputes only if both parties assent to arbitration *after* a controversy arises under a dealer franchise agreement. The district court held that the nameplate issue arose under a

No. 05-3276

franchise agreement within the meaning of the statute. Because only Süd's, not Volkswagen, had agreed to proceed to arbitration after the dispute had arisen, the issue could not be sent to arbitration. With respect to the alternate theory, however, the court held that Volkswagen's theory that Süd's had breached the Incentive Program because it failed to comply with the Construction Agreement was arbitrable because of the Construction Agreement's arbitration clause.

In short, all issues related to Süd's performance of the Construction Agreement were stayed pending arbitration, but the balance of the case was set to move forward in the district court.

## II

## DISCUSSION

### A.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, provides the starting point for our analysis. The FAA was enacted in 1925 against the backdrop of "centuries of judicial hostility to arbitration agreements." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225 (1987) (internal quotation marks omitted). This hostility was a vestige of the English common law, in which courts, protective of their own jurisdiction, had refused to enforce specific agreements to arbitrate; this practice persisted in the United States well into the twentieth century. Eventually, Congress reversed the common law trend and, in enacting the FAA, attempted "to place arbitration agreements 'upon the same footing as other contracts.'" *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (quot-

ing H.R. Rep. No. 96, at 1, 2 (1924)). The FAA accomplishes this goal by providing that binding arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, if one party to a contract containing an arbitration clause attempts to avoid arbitration and files suit in the district court, the other party may move to stay or dismiss the action on the ground that the FAA requires the arbitration clause of the contract to be enforced. *See id.* § 3 (authorizing a motion to stay); *id.* § 4 (authorizing a petition to compel arbitration).

Although reflecting a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), the FAA's purpose is not to provide special status for such agreements. Rather, it makes "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). The Supreme Court has made clear that "[a]rbitration under the Act is a matter of consent, not coercion and the parties are generally free to structure their arbitration agreements as they see fit" and "may limit by contract the issues which they will arbitrate." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). "[T]he federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Id.* at 476.

In its brief before this court, Süd's submits that the district court, having determined that certain issues are arbitrable, was "require[d]" to stay proceedings in their entirety pending arbitration. *See* Appellants' Br. at 13. In

support of this theory, Süd's first relies upon § 3 of the FAA, which provides that,

> upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3.

For arbitrable issues, a § 3 stay is mandatory. *See McMahon*, 482 U.S. at 226 ("[A] court *must* stay its proceedings if it is satisfied that an issue before it is arbitrable . . . .") (emphasis added)); *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 142 (7th Cir. 1978) ("If the agreement to arbitrate is valid the court has no further power or discretion to address the issues raised in the complaint but must order arbitration . . . .").

For remaining non-arbitrable issues, however, the FAA does not give courts express guidance on how to proceed. To fill this gap in the statute, Süd's proposes a rule that would require the district court to stay the *entire case* whenever it finds at least one arbitrable issue. Interestingly, although Süd's does not point us there, the literal language of the FAA, read in isolation, might provide some support for such a theory: Section 3 states that the court shall "stay the trial of *the action*"—not just *a part* of the action—if the suit is "brought upon" an arbitrable issue. 9 U.S.C. § 3 (emphasis added).

The courts, however, generally have not interpreted § 3 in this fashion. As we have remarked previously, "the

cases, perhaps concerned lest the tail wag the dog, treat the question whether to stay the entire case as discretionary in cases involving both arbitrable and nonarbitrable issues." *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997) (citing cases and secondary sources). The Fourth Circuit similarly has embraced this view in *American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88 (4th Cir. 1996):

> Enforcement of agreements to arbitrate under the Federal Arbitration Act may require piecemeal litigation, *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985), and the decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket, *Moses H. Cone Mem. Hosp.*, 460 U.S. at 20 n.23; *Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1461 (4th Cir. 1992). Therefore, we leave this issue for the district court to resolve on remand.

*Id.* at 97 (parallel citations omitted); *see also Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) ("When confronted with litigants advancing both arbitrable and nonarbitrable claims . . . courts have discretion to stay nonarbitrable claims."); *McCarthy v. Azure*, 22 F.3d 351, 361 & n.15 (1st Cir. 1994) (holding that a party is not "entitled as of right to an order staying litigation of all—or even most of—[its] claims," although noting that, "[o]f course, the district court in its discretion *could* stay litigation of nonarbitrable claims pending the outcome of an arbitration proceeding" (emphasis added)).

The Supreme Court has indicated its support for this interpretation of § 3 on at least two occasions. In *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985), the Court was untroubled by the prospect of "piecemeal"

litigation resulting from the stay of some issues but not others. "The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." *Id.* Similarly, in *Moses H. Cone Memorial Hospital*, the Court noted that, at the district court's discretion, litigation may proceed against parties who were not subject to the arbitration agreement, even though claims against the arbitrating parties have been stayed. *See* 460 U.S. at 20 & n.23. "That decision," the Court held, "is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket." *Id.* at 20 n.23.

An exception to this rule has been recognized when staying arbitrable issues, while allowing nonarbitrable issues to proceed in the district court, risks "inconsistent rulings" because the pending arbitration is "likely to resolve issues material to [the] lawsuit." *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 242 F.3d 777, 783 (8th Cir. 2001). The factors that bear on this inquiry include "the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays." *Id.* When these factors weigh in favor of staying the entire action pending arbitration, the district court may abuse its discretion in allowing the nonarbitrable issues to proceed absent a stay. In many instances, moreover, district courts actually may prefer to stay the balance of the case in the hope that the arbitration might help resolve, or at least shed some light on, the issues remaining in federal

court. *See, e.g, Hikers Indus. v. William Stuart Indus.*, 640 F. Supp. 175, 178 (S.D.N.Y. 1986).

Our decision in *Morrie Mages & Shirlie Mages Foundation v. Thrifty Corp.*, 916 F.2d 402 (7th Cir. 1990), *abrogated on other grounds*, *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1990), provides helpful guidance on this matter. In that case, we held that a district court's refusal to stay nonarbitrable issues pending the arbitration of related, arbitrable issues constituted an abuse of discretion. The buyer and seller to a corporate transaction had been ordered to arbitrate a controversy arising out of their purchase agreement, which contained an arbitration clause. The buyer's guarantor also was implicated in the lawsuit but had not executed a similar arbitration provision in its agreement to guarantee the buyer's performance. Refusing the guarantor's motion to stay its litigation with the buyer pending the result of the buyer-seller arbitration, the district court reasoned that the guarantor had failed to incorporate an arbitration clause into its agreement with the buyer and therefore could not benefit from a stay. Reversing, we held that a stay was required because the nonarbitrable issue of the guarantor's liability was "completely dependent upon the arbitrable issues of the fact and extent of [the buyer's] liability." *Id.* at 407. Due to this interdependence, we emphasized the "potential for impairment of the issues before the arbitrator due to the collateral estoppel effect of the [buyer-guarantor] litigation." *Id.* Thus, we ordered the district court to enter a stay and await the result of the buyer-seller arbitration.

According to Süd's, the issues sent to arbitration are so interconnected to the ones proceeding to trial that refusing to stay the entire action was an abuse of discretion. As an example, Süd's first invites our attention to the

question of whether it defaulted on the Loan Agreement by failing to make its first annual payment—an issue that the district court refused to stay. According to Süd's, there are two ways in which this issue is dependent upon the arbitrable question of whether it complied with the Construction Agreement. First, Süd's contends that, if the arbitrator finds that Süd's did not breach the Construction Agreement, no payments would be due under the loan. We must note that, as far as the record indicates, this first theory is incorrect. Under the Loan Agreement's default provisions, Süd's failure to comply with the Construction Agreement would trigger an obligation to repay the loan *in full and immediately*. However, the Loan Agreement also provides that, even if Süd's fully performs the Construction Agreement, it nevertheless must meet its alternate obligation of making loan payments in a timely fashion.

Süd's second argument concerning the interrelationship of its obligations under the Loan Agreement to the Construction Agreement deserves more attention. Süd's points out that its ability to repay the loan on time was dependent on receiving incentive payments from Volkswagen. These payments were, in turn, dependent on Süd's compliance with the Construction Agreement, the issue proceeding to arbitration. As the district court recognized, in this context, performance under the Construction Agreement is interrelated. If the arbitrator were to decide in due course that Süd's met its obligations under the Construction Agreement, Süd's would be entitled to the incentive payments that would have allowed it to repay

No. 05-3276                                                    13

the loan on time.[1] In the alternative, the arbitrator may
decide that it was Volkswagen's lack of good faith which
prevented Sud's from meeting its obligations under the
Construction Agreement, thus frustrating Sud's ability
to obtain the incentive payments, and, in turn, make its
payments under the Loan Agreement. *Cf. Cenco, Inc. v.
Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("A
breach of contract is excused if the promisee's hindrance
or failure to cooperate prevented the promisor from
performing the contract. *See* Restatement (Second) of
Contracts § 245 (1979)."). A district court certainly
would act within the bounds of its discretion if it deter-
mined that proceeding on the issue of liability under the
Loan Agreement in federal court, while the Construc-
tion Agreement is before the arbitrator, would waste
judicial resources, would risk inconsistent verdicts and,
ultimately, might prejudice one or both parties. *See
AgGrow Oils*, 242 F.3d at 783.

The district court understood the relationship between
the Süd's note obligation and its performance under the
Construction Agreement. Indeed, the court intimated
that, had this matter been the only issue before the court,
it well might have stayed the action until the completion
of the arbitration. However, the court was confronted
with a more complex situation, and, therefore, we must
consider these additional circumstances in determining
whether the district court abused its discretion in deciding
not to await the arbitrator's decision on Süd's compliance
with the Construction Agreement.

---

[1] Süd's entitlement to the incentive payments also depended
on whether it properly installed a Volkswagen dealer name-
plate. We discuss this issue later in the opinion.

The district court noted that the Loan Agreement executed by Süd's contained several conditions. The fourth condition made the entire amount of the loan due immediately upon noncompliance with the Construction Agreement. As we have just noted, the district court acknowledged that, because compliance with the Construction Agreement was a matter for the arbitrator, suit for collection on the Loan Agreement based on this condition was related to the arbitrator's decision. The court also noted, however, that the Loan Agreement created an independent obligation on the part of Süd's to pay a yearly installment of $100,000, an obligation not dependent on Süd's performance under the Construction Agreement. In this court, Süd's makes no argument that the court erred in its characterization of Süd's obligation under this clause. Moreover, before the district court, Süd's made no argument that its obligation under the second clause is not independent of its rights and obligations under the Construction Agreement, nor did it invite the district court's attention, with any specificity, to any potential for "inconsistent rulings" that might arise if litigation proceeded on the non-arbitrable issues. See AgGrow Oils, 242 F.3d at 783. In light of Sud's independent obligation to make payments on the Loan Agreement, we cannot say that the district court abused its discretion in failing to stay litigation concerning this issue.

The district court also was faced with another issue which, in its view, was not subject to arbitration and which, if Volkswagen were to prevail, could supply an avenue for relief completely independent of the Construction Agreement. Under the Incentive Agreement, receiving the incentives is conditioned upon compliance with the "Dealer Operating Standards," a component of the

Volkswagen Dealer Agreement. These standards required
Süd's to display a Volkswagen facade dealer nameplate
that meets Volkswagen's corporate identity requirements.
R.5, Ex.E at 6. Volkswagen's complaint asserts that, by
failing to comply with this requirement, Süd's disqualified
itself from earning incentives. As a practical matter, then,
if Volkswagen were to prevail on this claim, there would
be an independent basis for Volkswagen's denial of the
payments upon which Süd's claims it depended in order
to meet its loan payments.

The district court held that arbitration of this claim
was not authorized under the Motor Vehicle Franchise
Contract Arbitration Fairness Act of 2002, 15 U.S.C. § 1226.
The Fairness Act provides:

(a) Election of arbitration

(1) Definitions

For purposes of this subsection—

(A) the term "motor vehicle" has the meaning
given such term in section 30102(6) of Title 49;
and

(B) the term "motor vehicle franchise contract"
means a contract under which a motor vehicle
manufacturer, importer, or distributor sells
motor vehicles to any other person for resale to
an ultimate purchaser and authorizes such
other person to repair and service the manufac-
turer's motor vehicles.

(2) Consent required

Notwithstanding any other provision of law,
whenever a motor vehicle franchise contract pro-
vides for the use of arbitration to resolve a contro-

versy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy.

(3) Explanation required

Notwithstanding any other provision of law, whenever arbitration is elected to settle a dispute under a motor vehicle franchise contract, the arbitrator shall provide the parties to such contract with a written explanation of the factual and legal basis for the award.

(b) Application

Subsection (a) of this section shall apply to contracts entered into, amended, altered, modified, renewed, or extended after November 2, 2002.

*Id.*

The Fairness Act requires that, before car manufacturers and their dealerships settle a dispute through arbitration, "all parties" must consent in writing "*after* such controversy arises." *Id.* § 1226(a)(2) (emphasis added). The district court determined that, because only Süd's desired arbitration of this issue, the parties had not executed the bilateral, *post-dispute, written* agreement necessary for the nameplate issue to be submitted to arbitration.

Süd's nevertheless urges that, despite the term "after" in the statute, we should infer the requisite consent in Volkswagen's act of drafting the original franchise agreement. Invoking the legislative history of the Fairness Act, Süd's submits that the Act is intended to "*protect* motor vehicle *dealers* against automobile manufacturers" and to ensure

dealers "the remedy of arbitration that a dealer desires." Appellants' Br. at 18 (emphasis in original). When it is the dealership who wishes to arbitrate a dispute, Süd's contends, we should interpret the statute more leniently.

The legislative history cited by Süd's—a Senate Committee Report to the Fairness Act—provides an enlightening history of automotive franchise arrangements. As the report describes, for over half a century, Congress has understood "the imbalances in bargaining power" inherent in the relationship between car dealers and manufacturers.[2] S. Rep. No. 107-266, at 7 (2002), as reprinted in 2002 WL 32972956. According to the Senate Report, unlike other types of franchisees that have a wide selection of franchisers with whom to contract, automotive dealerships "may only obtain the right to merchandise and sell their product from an extremely limited group of manufacturers." *Id.* at 3. Leveraging this disparity in bargaining power, motor vehicle manufacturers historically have forced dealers

---

[2]  In 1956, Congress enacted the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221-1225, to provide dealerships with "recourse in Federal court against manufacturer abuses irrespective of contract terms." S. Rep. No. 107-266, at 7 (2002), *as reprinted in* 2002 WL 32972956. In codifying protections to remedy the inherent unfairness in the dealer-manufacturer relationship, this federal statute set the stage for the Fairness Act, passed some thirty-six years later. Although its predecessor statute provided a federal forum to enforce the good-faith obligations of car manufacturers, the Fairness Act expanded upon these protections by guaranteeing "that binding arbitration to resolve disputes involving a motor vehicle franchise contract is entered into only after voluntary agreement by both parties." *Id.* at 9.

into boilerplate franchise contracts "on a 'take it or leave it' basis." *Id.* Prominent in these "contracts of adhesion," *id.*, are mandatory arbitration clauses that remained enforceable under the FAA, despite attempts by state legislatures to prohibit unfair dealer-manufacturer arbitration.

Even if we accept Süd's submission that the drafters of the Fairness Act likely intended to equalize the bargaining equation in favor of the dealer, we cannot ignore that this same Senate Committee Report insists repeatedly, consistent with the statutory text, that "*both parties*" must consent to arbitration, and only "*after*" a controversy arises. *See, e.g., id.* at 2, 8, 9 (emphasis added). Indeed, if the legislative history confirms anything, it is that Congress intended such boilerplate arbitration clauses to be displaced in favor of "forums otherwise available" under federal or local law. *Id.* at 3. In view of this history, we refuse to depart from the Fairness Act's plain wording. As the statute provides, *both* parties must consent voluntarily to arbitrate a dispute under a manufacturer-dealer agreement and that consent must be expressed only *after* that dispute has arisen. The district court determined correctly that the record revealed that only Süd's has consented to arbitration at this stage. Accordingly, we must affirm the court's refusal to stay the dealer nameplate issue pending arbitration.

## Conclusion

In short, while the district court had the discretion to stay judicial proceedings until the arbitration was completed, we cannot say that the district court abused its discretion when it decided not to do so. The court recognized that the Loan Agreement contained a condition

No. 05-3276                                    19

not dependent on the Construction Agreement. If Volkswagen were to prevail on that issue, the first-year payment would be due no matter what result was reached in the arbitration proceeding. Moreover, the court correctly recognized that the parties' dispute with respect to whether Süd's complied with the dealership standards was not subject to arbitration and, if Volkswagen prevailed on its claim, provided, as a practical matter, another basis for denying Süd's participation in the incentive program.

For these reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

Clerk of the United States Court of
Appeals for the Seventh Circuit